J-S05032-26

2026 PA Super 172

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHABNAM MCALLISTER | : | |
| | : | |
| Appellant | : | No. 622 EDA 2025 |

Appeal from the Judgment of Sentence Entered January 29, 2025
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0000692-2023

BEFORE:   PANELLA, P.J.E., KING, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY FORD ELLIOTT, P.J.E.:                    **FILED AUGUST 3, 2026**

Appellant, Shabnam McAllister, appeals from the judgment of sentence imposed by the Court of Common Pleas of Montgomery County after the court found her guilty of theft by deception through false impression and financial exploitation of older adult or care-dependent person.[1]  Appellant challenges the sufficiency of the evidence supporting her convictions and the trial court's application of the sentencing statute at 42 Pa.C.S. § 9717.  Upon careful review, we affirm the judgment of sentence.

The victim, Usha Gulati, testified at trial that Appellant was employed to do things for her such as cooking, shopping, and taking care of her laundry,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3922(a)(1) and 3922.1(a), respectively.  The financial exploitation of older adult or care-dependent person statute became effective on August 30, 2021, and the Commonwealth's charge pursuant to that statute only pertained to Appellant's conduct after that date.  **See** N.T. Trial, 7/11/24, 5.

but that she considered Appellant to be like a family member. **See** N.T. 7/11/24, 28-29. Appellant acted as a caretaker for Ms. Gulati, seven days a week, between the hours of 8:00 a.m. or 9:00 a.m. until 3:00 p.m. or 4:00 p.m., at Ms. Gulati's home in North Wales, Pennsylvania. **See id.** at 30; N.T. Trial, 9/30/24, 5. Appellant's employment with Ms. Gulati started in 2017, at which point Ms. Gulati was about eighty years old, and ended on December 15, 2021. **See** N.T. 7/11/24, 27-28, 32; N.T. Trial, 9/30/24, 30-31.

In August of 2021, Ms. Gulati's son, Rajeev Gulati, who lived out-of-state, visited his mother to help her return items to her home that had been put into storage when Ms. Gulati's basement had flooded. **See** N.T. Trial, 9/30/24, 5, 8. With a power of attorney and his mother's request, Mr. Gulati reviewed his mother's bank statements. **See id.** at 9-10. He noticed that there was a number of checks to Appellant "that shouldn't have been there," in excess of the weekly payments that Appellant was supposed to have been paid. **Id.** at 9. Around the same time, Mr. Gulati also noticed examples of his mother's home falling into disrepair, that the home was "pretty filthy" and "dirty," and his mother looked "a little bit more emaciated than she had in the past." **Id.** at 14-15.

On December 15, 2021, Ms. Gulati's son informed Appellant that she was relieved of her employment duties to his mother. **See** N.T. Trial, 9/30/24, 25. In their text message exchanges at that time, Appellant encouraged Mr. Gulati to move his mother to an apartment closer to Appellant so she and her family could "take care of her more." **Id.** Mr. Gulati instead decided to move

his mother to Texas near his residence, after an interim period during which an aunt, who was a retired nurse, cared for Ms. Gulati. *See id.* at 26, 30.

To follow up on Mr. Gulati's initial review of his mother's financial records, Detective Michael Cantrell of the Lower Gwynedd Township Police Department in Montgomery County reviewed every check drawn from Ms. Gulati's Wells Fargo bank account from 2018 through 2021. *See* N.T. Trial, 7/11/24, 38-39. Appellant's agreed-upon pay rate with Ms. Gulati, during the relevant period, starting in 2018, was $2,520.00 each week. *See id.* at 39-41, 43-44. For the years 2019 through 2021, Detective Cantrell "saw that there were more than 52 checks written for" Appellant's weekly pay rate in each year. *Id.* at 39.

Detective Cantrell could see in the payment records that Ms. Gulati paid Appellant on "a loosely weekly basis." N.T. Trial, 7/11/24, 38-39, 42. Payments made to Appellant at the weekly rate of $2,520.00 "were coming as frequently [as] at least once a week" but "oftentimes, checks were written out to [Appellant] multiple times a week," including a notable one-week span when three such checks were written out to Appellant. *Id.* at 80.

During the detective's interview with Appellant, she claimed that Ms. Gulati agreed to a give her a raise in pay during the COVID pandemic, but, upon review of Ms. Gulati's bank records, Detective Cantrell "never saw a consistent increase in wages on a weekly basis." N.T. Trial, 7/11/24, 44. "Occasionally, there would be a check around [$2,700.00 or $2,790.00] sprinkled in … but [he] never saw evidence to support" Appellant's pay raise

claim. *Id.* In the course of his investigation, Detective Cantrell asked Ms. Gulati about a possible increase in pay to Appellant and Ms. Gulati responded, "I don't think so. I don't really remember, because fifteen [per hour] was quite a lot for me." *Id.* at 79. Ms. Gulati also confirmed that Appellant's pay rate was fifteen dollars per hour for the entire time she worked directly for her. *See id.* at 80.

Ms. Gulati's payment records also included payments made to persons and entities other than Appellant, such as an electric utility company (PECO), landscapers, family members, and other persons, and "it appeared that [Ms.] Gulati would pay whoever she needed to via check." N.T. Trial, 7/11/24, 45-46. Detective Cantrell made a table of all the checks written to Appellant from Ms. Gulati's Wells Fargo bank account for the years 2019 to 2021. *See id.* at 47-48. For 2019, he found fifty-eight checks that were drawn from the account that were addressed to Appellant in her weekly pay rate or more which resulted in an aggregate transfer of $145,240.00 from Ms. Gulati to Appellant for that year. *See id.* at 49. Appellant's combined yearly pay for that 52-week period should have been $131,040.00. *See id.* at 50.

Ms. Gulati informed Detective Cantrell that Appellant would also do her grocery shopping for her and she would give Appellant a check to cover the cost, but she never paid much attention to the amount of those checks. *See* N.T. Trial, 7/11/24, 53. She suggested that the usual amount for those grocery purchases was $300.00 per check. *See id.* For 2019, Detective Cantrell confirmed there were fifty-four miscellaneous payments, aside from

the identified "weekly" pay checks, made out to Appellant, many of which were in the amount of $390.00. *See id.* at 54. The total amount of those checks was $24,205.00. *See id.* at 54-55. Assuming that Ms. Gulati wrote a check for $300.00 per week for groceries as she asserted, the total amount for groceries for that period should have been $15,600.00, an amount that was $8,605.00 less than the amount Ms. Gulati had reimbursed Appellant. *See id.* at 54.

For 2020, seventy-seven "wage checks," *i.e.*, checks amounting to or greater than Appellant's weekly pay rate, were drawn from Ms. Gulati's bank account to pay Appellant. *See* N.T. Trial, 7/11/24, 55. The total amount paid to Appellant in those checks was $193,291.00, reflecting an overpayment of $62,251.00, based on Appellant's agreed-upon yearly income of $131,040.00. *See id.* at 50, 55-56. In addition to that overpayment amount, there was also $29,999.00 in unexplained funds paid to Appellant in "miscellaneous checks" drawn in 2020. *Id.* at 56.

For 2021, there were seventy-six "wage checks" drawn from Ms. Gulati's bank account to pay Appellant, reflecting a total aggregate payment of $195,750.00 to Appellant. N.T. Trial, 7/11/24, 56. Consistent with Appellant's agreed-upon yearly income, those wage checks reflected an overpayment of $64,710.00. *See id.* at 57. For that time period, there also was $5,830.00 in unexplained funds paid to Appellant in smaller "miscellaneous checks." *See id.*

At Appellant's preliminary hearing, Ms. Gulati acknowledged that additional checks and credit card payments were made to contractors and members of Appellant's family. *See* N.T. Trial, 7/11/24, 57-58. She also remembered that they had a "handyman" at her home. *Id.* at 59. When asked if she would write checks to the handyman or whether she would reimburse Appellant for payments made to this handyman, Ms. Gulati testified that "it could go either way." *Id.* She remembered a "significant kitchen project," the use of a tree removal service, a "sidewalk repair project," and a sump pump repair at her home, but she was unable to specifically recall whether she paid for those services directly by check or reimbursed Appellant. *Id.* at 60-62. Detective Cantrell confirmed that there were some checks from Ms. Gulati's bank account made payable directly to contractors. *See id.*

With respect to the checks written on her account during the relevant period, Ms. Gulati told Detective Cantrell that Appellant "would fill out the check for her, meaning all fields except for the signature line. Per [Ms. Gulati], it was hard [for her] to write, [and] hard [for her] to see. So[, Ms. Gulati's] job, in this role, is she would just sign her name." N.T. Trial, 7/14/24, 66.

At trial, Detective Cantrell testified to Appellant's statement admitting some overpayments, as follows:

> [Appellant] admitted that she wrote herself more checks than she deserved. She would not agree [at] that moment [with] the number that I alleged. She felt that the number that I was alleging in overpayments was way too high. She felt that she could justify them. So[,] she said that she would need at least a week, that we could meet up again, she was going to look through

some records, and then we would meet back up, and then she would give me a more accurate number.

N.T. Trial, 7/14/24, 81. Appellant did not "follow up" with Detective Cantrell with respect to this admission. *Id.*

Appellant proceeded to be tried at a bifurcated non-jury trial held on July 11 and September 30, 2024. At trial, the then eighty-eight-year-old victim testified by two-way, audio/visual communication from an assisted living facility in which she was residing in California. *See* N.T. Trial, 7/11/24, 15-16. Her ability to testify in person was hindered by her Parkinson's disease, and thus Appellant's counsel agreed to permit Ms. Gulati to testify remotely. *See id.* at 15. In addition to Ms. Gulati, the Commonwealth presented testimony from Ms. Gulati's son and Detective Cantrell. Counsel also agreed to the admission of Ms. Gulati's preliminary hearing testimony by stipulation and further stipulated to the authenticity of the financial records of the victim regarding her Wells Fargo bank account that were obtained pursuant to a search warrant. *See id.* at 16, 18.

Appellant also testified. She maintained that, while her pay rate when she started working directly for Ms. Gulati was $15.00 per hour, she entered into a verbal agreement for a raise to $20.00 per hour at the end of 2019. *See* N.T. Trial, 7/11/24, 35-36, 44, 54-55. She agreed that Ms. Gulati gave her $300.00 checks for groceries, but that amount was not enough for groceries after the start of the COVID pandemic. *See id.* at 45-46. She claimed that various checks to her were meant to cover things she paid for with cash on behalf of Ms. Gulati, like hair care, pedicures, housekeeping, and

other expenses such as the services of the handyman and larger repairs with respect to the kitchen, bathroom, sidewalk, and tree removal. *See id.* at 38-42, 47-48, 57. Appellant agreed that Ms. Gulati's house was "falling apart," but that Ms. Gulati's "[f]amily was away." *Id.* at 41, 48. She alleged that Ms. Gulati knew "what she[ was] doing" with the checks made out to her: "She write the check. She read and then she signed. And then, when the statement come at the end of the month, she check all the checks." *Id.* at 36-37.

Appellant claimed on cross-examination that Ms. Gulati let her borrow money from her. *See* N.T. Trial, 7/11/24, 55. Even though she maintained that Ms. Gulati would "write the check," in her direct examination testimony, she noted, on cross-examination, that Ms. Gulati could not "sign too many checks [because of] her Parkinson's Disease." *Id.* at 55-56.

Appellant also presented her husband, Charles McAllister, Jr., to attest to her reputation in the community for being a law abiding and truthful person. *See* N.T. 7/11/24, 59-60. After the defense rested, the Commonwealth recalled Ms. Gulati's son on rebuttal to address the fact that his mother would typically give checks as gifts to family members rather than cash, as Appellant had suggested in her testimony. *See id.* at 61-64, *compare with id.* at 38-39.

The trial court found Appellant guilty of the above-referenced offenses and found her not guilty of theft by unlawful taking, forgery, and access device

fraud.[2]  **See** N.T. Trial, 7/11/24, 77; Trial/Plea/Sentence Form, 1.  Sentencing

was deferred for the preparation of a presentence investigation report.  **See**

N.T. Trial, 7/11/24, 77.  On January 29, 2025, the court sentenced Appellant

to fourteen months to ten years' imprisonment for theft by deception through

false impression with a concurrent term of seven years' probation for financial

exploitation of older adult or care-dependent person, with an order of

restitution in the amount of $113,400.00.[3]  **See** Trial/Plea/Sentence Form, 2;

Restitution Order, 1/29/25, 1; N.T. Sentencing Hearing, 1/29/25, 33-34, 37.

The court also ordered Appellant to undergo one hundred hours of community

service, to have no contact with the victim and her family, and to not "work

with older or care dependent individuals of any sort."  **Id.** at 34, 37.

_____

[2] 18 Pa.C.S. §§ 3921(a), 4101(a)(2), and 4106(a)(1)(iv), respectively.

[3] The imprisonment term was within the standard range recommended by the Sentencing Guidelines for the theft conviction: six to fourteen months' imprisonment, plus or minus six months for aggravating or mitigating circumstances.  **See** Guideline Sentencing Form, 1/29/25, 1 (stating applicable guideline range and identifying that Appellant had a prior record score of zero); 204 Pa. Code § 303.15 (7th ed., amend. 6) (indicating an offense gravity score of seven for theft by deception involving a false impression with a taking between $100,000.00 and $500,000.00); 204 Pa. Code § 303.16(a) (7th ed., amend. 6) (applicable basic sentencing matrix). At sentencing, the parties agreed that that there was an applicable mandatory minimum imprisonment statute requiring a minimum of twelve months' imprisonment pursuant to 42 Pa.C.S. § 9717.  **See** N.T. Sentencing Hearing, 1/29/25, 6 (Prosecutor: "There is a mandatory minimum of twelve months, because the victim is over 60 years old pursuant to Title 42, Section 9717."); *id.* at 7 (Appellant's counsel agreeing to the "application of the mandatory"). Based on the agreed-upon application of Section 9717, the Commonwealth identified the applicable standard sentencing guideline range as "twelve to fourteen months."  **See id.** at 6.

The trial court explained at the sentencing hearing that its verdict and the restitution amount were based on the evidence of excess wage checks drawn by Appellant and not based on the miscellaneous checks for smaller amounts:

I think it's important to bring some clarity, and I believe that I put this on the record at the time I imposed the verdict, but I want to make sure that I did. The [c]ourt found that the total theft was $113,400[.00]. And that was broken down with specific checks.

In the year 2019, this [c]ourt found that [Appellant] paid herself four extra checks in the amount of $10,080[.00].

In the year 2020, this [c]ourt found that she paid herself twenty extra checks. So, instead of paying herself [for] 52[ weeks], she paid herself 72 checks. And the amount of the theft was $50,400[.00].

And in the calendar year 2021, instead of paying herself for 52 weeks of pay, she took it upon herself to pay herself 73 weeks of pay, 21 extra pay periods, [for] a total amount of $52,920[.00]. That was the amount of the theft.

This [c]ourt did not find [Appellant] guilty of thousands of other dollars that she paid herself, recognizing that there was some evidence that those thousands of dollars might have been paid for [Ms.] Gulati's expenses. And there was certainly not evidence to establish theft beyond a reasonable doubt. And certainly, this [c]ourt gave [Appellant] the benefit of the doubt and credit and did not find her guilty of those thefts, because there was a question as to whether that was money that was taken or used for the victim's expenses.

So, this [c]ourt was certainly aware, throughout the entire trial, that some funds were taken from Ms. Gulati for her expenses.

N.T. Sentencing, 1/29/25, 28-29.

On February 28, 2025, present counsel entered his appearance as counsel for Appellant and filed a motion for permission to file post-sentence motions *nunc pro tunc* and a notice of appeal. **See** Entry of Appearance, 2/28/25, 1; Application to File Post-Sentence Motions *Nunc Pro Tunc*, 2/28/25, 1-3; Notice of Appeal, 2/28/25, 1. On March 4, 2025, the trial court granted the motion seeking *nunc pro tunc* consideration of post-sentence motions. **See** Order on Motion to File Post Sentence Motions *Nunc Pro Tunc*, 3/4/25, 1. Appellant thereafter filed counseled post-sentence motions *nunc pro tunc*, in which she raised challenges to the sufficiency and weight of the trial evidence, sought reconsideration of her sentence, and requested modified bail pending appeal. **See** Post-Sentence Motions *Nunc Pro Tunc*. With the exception of granting the modified bail request pending appeal, the trial court denied Appellant's post-sentence motions *nunc pro tunc*. **See** Order on Post Sentence Motions, 5/6/25, 1-2.

With respect to the instant appeal, Appellant and the trial court have satisfied their obligations under Pennsylvania Rule of Appellate Procedure 1925. **See** Order for Concise Statement, 5/6/25, 1; Rule 1925(b) Statement ("Statement of Errors"), 5/27/25, 1-4; Trial Court Opinion, 7/3/25, 1-30.

On June 25, 2025, our Court ordered Appellant to show cause within ten days as to why the trial court's order granting her request to file post-sentence motions *nunc pro tunc* and her subsequent post-sentence motions should not be considered legal nullities where those documents were not filed until more than thirty days after the imposition of the judgment of sentence on appeal.

*See* Rule to Show Cause Order, 6/25/25, 1 (citing ***Commonwealth v. Dreves***, 839 A.2d 1122 (Pa. Super. 2003) (trial court's decision on request to file otherwise untimely post-sentence motion *nunc pro tunc* must be rendered within 30 days of the imposition of sentence)). Appellant filed a response, arguing that her instant appeal was timely filed but asking this Court to defer any ruling as to waiver caused by the timeliness of her post-sentence motions to the merits panel assigned to this appeal. ***See*** Appellant's Response to Rule to Show Cause, 6/26/25, ¶¶ 7-8, 16-17. On July 2, 2025, we discharged the rule to show cause order without prejudice for the panel assigned to decide the merits of this appeal to revisit the issue raised in the order. ***See*** Superior Court Order, 7/2/25, 1.

Appellant presents the following questions for our review:

I. Whether the trial court erred in finding sufficient evidence to convict Appellant of theft by deception and financial exploitation of an elderly person where the Commonwealth failed to prove beyond a reasonable doubt that Appellant unlawfully obtained money from the complainant given that the complainant testified she knowingly signed and issued checks as either agreed-upon compensation or reimbursement for expenses, was no longer competent at the time of trial to establish that any theft or overpayment occurred, and the Commonwealth presented no independent evidence of a crime apart from Appellant's vague statement, which should have been excluded from consideration under the *corpus delicti* rule[?]

II. Did the trial court err in sentencing Appellant to a state sentence at least in part based on its incorrect belief that a mandatory minimum applied to her conviction for financial exploitation of an elderly person?

Appellant's Brief, 5 (suggested answers omitted).

Before addressing Appellant's substantive claims, we will address the issue raised by our rule to show cause order. In this case, Appellant filed a notice of appeal and a motion for permission to file post-sentence motions *nunc pro tunc* on the last day of the thirty-day period for filing an appeal, twenty days after the deadline for filing timely post-sentence motions elapsed. **See** Pa.R.A.P. 903(a) (general rule requiring a notice of appeal to be filed "within 30 days after the entry of the order from which the appeal is taken"); Pa.R.Crim.P. 720(A)(1) (providing, with exceptions that do not apply here, that written post-sentence motions "shall be filed no later than 10 days after imposition of sentence"). The trial court thereafter granted Appellant's motion for permission to file post-sentence motions *nunc pro tunc* beyond the thirty-day appeal period. **See** Order on Motion to File Post Sentence Motions *Nunc Pro Tunc*, 3/4/25, 1. The court subsequently denied, with the exception of a grant of a request for modified bail pending appeal, Appellant's post-sentence motions *nunc pro tunc* while the instant appeal was pending. **See** Order on Post Sentence Motions, 5/6/25, 1-2.

When Appellant filed her motion for permission to file post-sentence motions *nunc pro tunc* at 11:47 a.m. on February 28, 2025, the trial court still had the discretion to grant it. This Court has recognized "that under 42 Pa.C.S.[] § 5505, if no appeal had been taken, within 30 days after the imposition of sentence, the trial court has the discretion to grant a request to file a post-sentence motion *nunc pro tunc*." **Commonwealth v. Dreves**, 839 A.2d 1122, 1128 (Pa. Super. 2003) (*en banc*). When Appellant filed her notice

- 13 -

of appeal later that day at 3:25 p.m., however, she divested the trial court of its jurisdiction to rule on her motion for *nunc pro tunc* consideration of post-sentence motions. ***See*** Pa.R.A.P. 1701(a) ("Except as otherwise prescribed by these rules, after an appeal is taken … the trial court … may no longer proceed further in the matter."); Pa.R.A.P. 1701(b)(3)(ii) (exception to the general rule in subsection (a) for a trial court to grant reconsideration of the order on appeal where "an order expressly granting reconsideration of such prior order is filed in the trial court … within the time prescribed by [the Rules of Appellate Procedure] for the filing of a notice of appeal"); ***see also Commonwealth v. Gordon***, 477 A.2d 1342, 1345 (Pa. Super. 1984) (noting "[i]f an appeal has been taken, then the general rule is that the trial court has no jurisdiction to modify its sentence").

Given the timing of the filing of Appellant's motion for permission to file post-sentence motions *nunc pro tunc* and her notice appeal, the trial court's orders granting the former motion, Appellant's subsequently filed post-sentence motions (with the exception of her request for modified bail), and the trial court's order denying the untimely post-sentence motions (with the exception of the court's grant of modified bail) were legal nullities for our purposes.[4] ***See, e.g.***, ***Commonwealth v. Ailey***, 350 A.3d 1034, 1041 (Pa.

_____

[4] Appellant's post-sentence request for modified bail and the trial court's May 6, 2025 order granting modified bail pending appeal were reviewable by the trial court consistent with our rules of appellate procedure. ***See*** Pa.R.A.P. 1762(a) ("Applications relating to bail when an appeal is pending shall
*(Footnote Continued Next Page)*

Super. 2025) (trial court's grant of a Commonwealth's motion to file an amended notice of appeal *nunc pro tunc* while appeal was already pending treated as a legal nullity). We agree with Appellant that her notice of appeal was timely filed and thus we have jurisdiction for this appeal, however, we conclude that her post-sentence motions were legal nullities, incapable of preserving any claims for our review. ***See, e.g., Commonwealth v. Nischan***, 928 A.2d 349, 355 (Pa. Super. 2007) (concluding, in part, that a represented defendant's *pro se* post-sentence motion was a nullity and did not preserve a challenge to the discretionary aspects of a sentence).

In her first issue, Appellant challenges the sufficiency of the evidence supporting both of her convictions which is cognizable on appeal. ***See*** Appellant's Brief, 15-23. In particular, she asserts that: (1) "the Commonwealth failed to prove beyond a reasonable doubt that [she] stole money from the complainant," ***id.*** at 15; (2) Ms. Gulati "did not testify that the payments were not either agreed upon salary or reimbursements for expenses she had incurred," ***id.*** at 19; (3) Ms. Gulati's son and Detective Cantrell could not offer personal knowledge of any exploitation of Ms. Gulati by Appellant and "only [Ms. Gulati] could have properly testified that the

---

ordinarily first be presented to the trial court…"); ***see also*** Pa.R.A.P. 1701(b)(1) (noting that, after an appeal is taken, the trial court may "take action" with respect to matters that are "ancillary to the appeal"); ***see, e.g., Commonwealth v. Becher***, 2024 WL 4040484, *3 (Pa. Super., filed Sept. 4, 2024) ("our Rules expressly provide that a trial court retains jurisdiction to make decisions about a criminal defendant's bail status despite the pendency of an appeal in a criminal case") (unpublished *per curiam* memorandum cited for persuasive value pursuant to Pa.R.A.P. 126(b)(2)) (28 WDM 2024).

money was in fact stolen and not used for an agreed upon raise or reimbursements for expenses," *id.* at 20; and (4) her statement to the detective "was vague and did not include an admission that she took any particular amount in excess of what she was owed, and it also should not have been admitted or considered as part of [the trial] evidence under the *corpus delicti* doctrine." *id.* at 20.

We apply the following well-settled standard of review when analyzing challenges to the sufficiency of the evidence:

> the standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence presented, is free to believe all, part, or none of the evidence.

*Commonwealth v. Marberger*, 344 A.3d 403, 410-11 (Pa. Super. 2025) (citation and internal brackets omitted). "Because evidentiary sufficiency is a question of law, our standard of review is *de novo*, and our scope of review is plenary." *Id.* (citation and internal brackets omitted).

- 16 -

Theft by deception, as charged under 18 Pa.C.S. § 3922(a)(1), is defined, in relevant part, as follows:

**(a)** **Offense defined.**--A person is guilty of theft if [s]he intentionally obtains or withholds property of another by deception. A person deceives if [s]he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that [s]he did not subsequently perform the promise[.]

[…]

**(b)** **Exception.**-- The term "**deceive**" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed.

18 Pa.C.S. § 3922(a)(1), (b) (emphasis in original).

The financial exploitation of older adult or care-dependent person statute provides that: "A person in a position of trust who commits the offense of financial exploitation of an older adult or care-dependent person shall be subject to criminal penalties specified under subsection (b)." 18 Pa.C.S. § 3922.1(a).[5]

For purposes of 18 Pa.C.S. § 3922.1, an "older adult" is defined as "[a] person who is at least 60 years of age" and a "care-dependent person" is defined as "[a]n adult who, due to physical or cognitive disability or

_____

[5] The subparts under subsection (b) establish separate sentencing gradings for the offense based on "the amount involved." 18 Pa.C.S. § 3922.1(b).

- 17 -

impairment, requires assistance to meet needs for food, shelter, clothing, personal care or health care." 18 Pa.C.S. § 3922.1(f). The statute defines a person in a "position of trust" as including, *inter alia*, a "person [who] receives monetary or other value consideration for providing care for an older adult or care-dependent person." **Id.** "Financial exploitation" is:

> The wrongful or unauthorized taking or attempt to take by withholding, appropriating, concealing or using the money, assets or property of an older adult or care-dependent person, including any act or omission taken by a person, including through the use of a power of attorney, guardian, custodian, trustee, personal representative or conservator of an older adult or care-dependent person by an individual who stands in a position of trust and confidence with an older adult or care-dependent person, including business transactions to:
>
> (1) obtain or attempt to control, through deception, intimidation or undue influence, over the older adult's or care-dependent person's money, assets or property to deprive the older adult or care-dependent person of the ownership, use, benefit or possession of the older adult's or care-dependent person's money, assets or property; or
>
> (2) convert or attempt to convert money, assets or property of the older adult or care-dependent person to deprive the older adult or care-dependent person of the ownership, use, benefit or possession of the older adult's or care-dependent person's money, assets or property.

18 Pa.C.S. § 3922.1(f).

We will address the last part of Appellant's argument involving the application of the *corpus delicti* rule first because, in making that argument, Appellant encourages us to not consider her statement to Detective Cantrell in conducting our sufficiency review, and that may bear on our ultimate

determination as to whether the evidence proved that Appellant committed unlawful takings from Ms. Gulati.

With respect to claims involving the *corpus delicti* rule, we recently noted the following:

> *Corpus delicti*, or the "body of the crime," requires the Commonwealth "to establish that a crime had actually occurred before a confession or admission of the accused connecting [her] to the crime can be admitted." [**Commonwealth v. Murray**, 174 A.3d 1147, 1154 (Pa. Super. 2017)] (citation omitted). "This rule is rooted in the hesitancy to convict a person of a crime solely on the basis of that person's statements." [**Commonwealth v. Bullock**, 170 A.3d 1109, 1117 (Pa. Super. 2017)] (citation omitted). "The *corpus delicti* may be established by circumstantial evidence." **Commonwealth v. Young**, 904 A.2d 947, 956 (Pa. Super. 2006) (citation omitted).
>
> Application of the *corpus delicti* rule is a two-step process, where the first step concerns the trial court's admission of the statements, and the second step concerns the fact-finder's consideration of those statements:
>
> > (1) In the first phase, the court determines whether the Commonwealth has proven the *corpus delicti* of the crimes charged by a preponderance of the evidence. If so, the confession or extrajudicial statement of the defendant is admissible;
> >
> > (2) In the second phase, the rule requires that the Commonwealth prove the *corpus delicti* to the fact[-]finder's satisfaction beyond a reasonable doubt before the fact[-]finder is permitted to consider the confession or extrajudicial statement in assessing the defendant's innocence or guilt.
>
> **Bullock**, 170 A.3d at 1118 (citations and internal quotation marks omitted).

*Commonwealth v. Lassends*, --- A.3d ----, 2026 WL 571902, *2 (Pa. Super., filed Mar. 2, 2026).

Appellant acknowledges that her trial counsel did not object to the admission of her statement on *corpus delicti* grounds, but she alleges that, under the second part of the two-part *corpus delicti* test, the trial court could not have considered her statement to Detective Cantrell "until the Commonwealth established *corpus delicti* beyond a reasonable doubt." Appellant's Brief, 21. She cites our opinion in *Commonwealth v. Chambliss*, 847 A.2d 115, 120-21 (Pa. Super. 2004), for the proposition that "failure to object to admissibility on *corpus delicti* grounds does not prevent argument on the second prong of the two-part test," and argues that her claim based on the second part of the *corpus delicti* test was not waived by a lack of an objection below. *See* Appellant's Brief, 21. Appellant misconstrues *Chambliss* in these regards.

In *Chambliss*, the defendant's counsel did not object to the admission of Chambliss's statement at issue and thus we found that Chambliss did not preserve "a challenge to the admissibility of the confession." *See Chambliss*, 847 A.2d at 120. Chambliss's counsel however, "notified the trial court," during closing argument, "that the admission of [the statement] required a consideration of the *corpus delicti* rule." *Id.* at 121. The trial court rejected that claim due to the lack of a prior objection and, on appeal, we concluded that the lack of a prior objection only waived a challenge to the application of

the first prong of the *corpus delicti* test but did not effect a waiver as to the second-prong:

> We do not find that counsel's failure to raise a timely *corpus delicti* challenge to the admissibility of the confession prevents counsel from invoking the rule prior to the fact[-]finder's deliberations. As the courts of this Commonwealth have routinely stated, the *corpus delicti* rule places two distinct burdens on the Commonwealth. The first arises during the Commonwealth's presentation of the evidence and concerns the admissibility of the evidence, while the second arises before the fact[-]finder's deliberations and concerns the quantum of evidence necessary before a fact[-]finder may consider a defendant's extrajudicial confession. While we recognize that counsel did not specify, during argument, whether he sought to challenge the first, the second or both prongs of the rule, we find that the trial court did not afford counsel the opportunity to develop this argument. By identifying "a corpus issue" prior to the fact[-]finder's deliberations, we find that counsel has sufficiently preserved a challenge to the trial court's application of the second prong.

*Id.* (citations omitted).

*Chambliss* did not relieve Appellant of all issue preservation obligations for purposes of raising a direct review claim of trial court error with respect to the second prong of the *corpus delicti* test as Appellant suggests. It merely held that such a claim concerning the second prong of that test may be preserved prior to deliberations by a fact-finder and, in Chambliss's case, the trial court erroneously deprived Chambliss of the opportunity to preserve such a claim at that point by rejecting the assertion of a "*corpus delicti* issue" based on a lack of a prior objection.

Here, our review of the record fails to uncover any discussion of the *corpus delicti* rule at trial or any issue raised about that rule by Appellant prior

to the trial court's deliberation, and Appellant fails to direct us to any part of the record where any claim based on the *corpus delicti* rule was preserved before the trial court. In the absence of any related objection prior to the trial court's deliberation, Appellant waived her argument that the trial court should have disregarded her statement to the detective in the course of its deliberations because the Commonwealth had not proven the *corpus* of the crime beyond a reasonable doubt. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

To the extent that Appellant asserts that "sufficiency challenges may be raised for the first time on appeal," *see* Appellant's Brief, 22, we note that, based on our recent opinion in *Lassends*, that an unpreserved *corpus delicti* claim cannot be presented as a basis for limiting the scope of review for an appellate challenge to the sufficiency of the evidence:

> We decline to interpret the second phase of the *corpus delicti* analysis as a limit on the scope of our review of a sufficiency challenge. In *Commonwealth v. Reyes*, our Supreme Court **separately** analyzed the issue of sufficiency and the issue of whether the Commonwealth proved the *corpus delicti* of the crime beyond a reasonable doubt. 681 A.2d 724 ([Pa.] 1996). The [Supreme] Court commenced its review by addressing the sufficiency of the evidence, and, in so doing, considered Reyes's confession to the crime. *Id.* at 726-27. After finding the evidence sufficient to support Reyes's conviction, the [Supreme C]ourt separately addressed the *corpus* issue. *Id.* at 727. The [Supreme] Court restated the two steps of the *corpus delicti* analysis and agreed with Reyes that the trial court had applied the incorrect standard for considering his out-of-court statements. *Id.* at 730.

In sum, the *corpus delicti* "analysis aligns with an evidentiary issue, for which the remedy is a new trial [and] does not comport with a sufficiency claim, which results in discharge if successful." ***Commonwealth v. Torner***, 2025 WL 1905486 at *5 (Pa. Super.[, filed] July 10, 2025) (unpublished memorandum opinion), pet. for allowance of appeal filed, 398 MAL 2025.[6] Notably, the Supreme Court in **Reyes** considered **all** evidence from trial when it reviewed the sufficiency of the evidence[.]

**Lassends**, 2026 WL 571902 at *4 (footnotes and parallel citation omitted; emphasis in original). Accordingly, we will review Appellant's sufficiency claim by considering all the evidence received at trial, including Appellant's statement to Detective Cantrell.

Appellant's remaining sufficiency arguments fail outright, because she does not review the evidence presented consistent with our controlling

---

[6] After **Lassends** was decided, our Supreme Court vacated the cited unpublished memorandum in **Torner**, upon a grant of a petition for allowance of appeal in that case in light of ***Commonwealth v. Walker***, 350 A.3d 54 (Pa. 2026) (holding, *inter alia*, that, when the admissibility of a defendant's other bad acts evidence is premised upon the "common plan, scheme and design" exception to Pennsylvania Rule of Evidence 404(b)'s general rule precluding the admission of propensity evidence, the Commonwealth must establish either: "(1) the offenses constitute 'signature crimes' – that is, they are so unique and distinctive that they must have been committed by the same perpetrator – or; (2) the offenses were linked to achieve a common goal"). ***See Commonwealth v. Torner***, 2026 WL 468792 (Pa., filed Feb. 19, 2026) (table) (398 MAL 2025). As the section of **Torner** cited by **Lassends** only pertained to Torner's sufficiency claim, addressing the *corpus delicti* doctrine, and not Torner's separate evidence admission challenge involving the "common plan, scheme and design" exception to Rule 404(b), the vacation of the unpublished memorandum in **Torner** based on **Walker** does not implicate the **Lassends** panel's reliance on the vacated memorandum as persuasive authority. ***See Commonwealth v. Torner***, 2026 WL 892927, *3 (Pa. Super., filed Apr. 1, 2026) ("Our analysis of Torner's other issue, regarding the sufficiency of the evidence did not implicate Torner's statement to DeStefano. We thus determine it to be unaffected by the new rule of **Walker**.") (unpublished memorandum) (citation omitted).

standard of review. Her arguments that the evidence was insufficient because Ms. Gulati could not "rule out that Appellant had written checks to herself to reimburse herself for authorized expenses she had incurred" or that that Ms. Gulati's son and Detective Cantrell's testimony should be discounted on the basis of their lack of "personal knowledge" as to the nature of the payments made to Appellant amount to assertions that only direct evidence of financial exploitation could suffice to prove her guilt. These arguments run counter to the well-established rule that "[t]he Commonwealth may sustain its burden of proving every element of the crimes[s] beyond a reasonable doubt by means of wholly circumstantial evidence." **Commonwealth v. Quel**, 27 A.3d 1033, 1037-38 (Pa. Super. 2011) (citation omitted).

Here, even before we turn to the fact that Appellant admitted to Detective Cantrell that "she wrote herself more checks than she deserved," **see** N.T. Trial, 7/14/24, 81, the evidence presented below – when reviewed in the light most favorable to the Commonwealth – provided ample circumstantial evidence from which the trial court could reasonably infer that Appellant used her position as a caregiver to Ms. Gulati to improperly obtain funds from the victim through the use of deception.

The trial court – as the fact-finder at trial – aptly reviewed that evidence as follows:

> The evidence demonstrated that Appellant received an overpayment for wages. Appellant was in charge of all of Ms. Gulati's checks. Appellant was in control of Ms. Gulati's finances. Appellant filled out each field of the check. Appellant knew that Ms. Gulati's health was declining and she had trouble with her

eyesight. Appellant knew that Ms. Gulati trusted Appellant and treated her like family. The evidence shows that Appellant took matters into her own hands and paid herself more than the agreed-upon wage rate. She intentionally obtained extra money for herself from Ms. Gulati without her knowledge.

The court determined that the total amount of the theft was $113,400[.00]. The court thoroughly examined the bank records and calculated this amount of theft based upon the testimony and exhibits presented at trial. In the year 2019, the court determined that Appellant paid herself four extra checks in the amount of $10,080[.00]. In the year 2020, the court determined that Appellant paid herself twenty extra checks, amounting to 72 checks rather than the 52 she was entitled to. The amount of theft for 2020 was $50,400[.00]. In the year 2021, instead of paying herself for 52 weeks, she paid herself 73 weeks of pay. The total amount of theft for 2021 was $52,920[.00]. The court did not find Appellant guilty of thousands of other dollars that she paid herself, recognizing that there was some evidence that the money might have been used to pay for Ms. Gulati's expenses. The overpayment of $113,400[.00] that Appellant obtained from Ms. Gulati was a theft. In essence, Appellant wrote herself additional checks as she saw fit, cashed them[,] and kept the money.

For the crime of theft by deception, the Commonwealth established beyond a reasonable doubt that Appellant intentionally obtained property from Ms. Gulati by deception. The evidence demonstrated that Appellant intentionally obtained money from Ms. Gulati, deceiving her into believing she was signing checks for funds that were owed to Appellant, when in fact they were overpayment of wages that Ms. Gulati never agreed to pay. The court's finding that Appellant intentionally obtained $113,400[.00] for herself from the elderly victim is supported by the evidence presented in this case.

The evidence showed that Appellant stole from Ms. Gulati in a method that was devious and deceitful. Appellant knew what she was doing, took it upon herself to take money from Ms. Gulati[,] and admitted that she took more than what was due to her for a period of at least three years. It was reasonable for the court to believe that the calculated overpayments were in fact overpayments constituting theft and not reimbursements for other expenses. The evidence showed there was additional money paid

to Appellant to cover expenses. These amounts were testified to by the detective and were categorized as miscellaneous amounts. In addition, the evidence showed that there were various checks paid to the landscapers and plumbers to cover those expenses. The evidence in this case was sufficient to convict Appellant of theft by deception.

For the crime of financial exploitation of an older adult or care dependent person, the Commonwealth established beyond a reasonable doubt that Appellant was in a position of trust with respect to Ms. Gulati in being her caretaker and providing care for her 24 hours a day, 7 days a week. It was Appellant's responsibility to either provide care Ms. Gulati needed or employ associates to provide care when Appellant was not working. Ms. Gulati trusted Appellant not only for her physical care, but also to handle her financial matters. The Commonwealth established beyond a reasonable doubt that Appellant carried out the wrongful or unauthorized taking by withholding, appropriating, concealing, or using the money, assets, or property of an older adult or care dependent person. The evidence showed that Appellant took advantage of a vulnerable elderly woman for whom she was the caregiver. The evidence showed beyond a reasonable doubt that Appellant exercised a violation of the trust placed in her by the elderly victim. Ms. Gulati trusted Appellant and depended on Appellant. Appellant betrayed her.

Trial Court Opinion, 7/3/25, 19-22 (record citations omitted).

We agree with the trial court's review of the sufficiency of the evidence presented and adopt it as our own analysis. We additionally note that the lack of a regular demonstrated increase in Appellant's apparent wage checks undermined the credibility of Appellant's claim that she had received a raise in pay from Ms. Gulati during the relevant time period. The detective's review of the checks paid to Appellant circumstantially proved Ms. Gulati's assertion that there was no increase in pay from Appellant's original agreed-upon wage rate. *See* N.T. Trial, 7/11/24, 44 (Detective Cantrell: "I never saw a consistent increase in the wages on a weekly basis). *Cf. Commonwealth v.*

*Stetler*, 95 A.3d 864, 887 (Pa. Super. 2014) ("The Commonwealth can establish the existence of an agreement by circumstantial evidence, and need not rely on direct evidence."). In any event, the difference in the pay raise Appellant claimed would not have remotely explained the disparity in wage overpayments found by the trial court.

Moreover, the detective's observation of the checks paid directly to contractors, *see* N.T. Trial, 7/11/24, 62, undermined Appellant's suggestion that poor accounting of reimbursements alone explained the substantial overpayments. The trial court's interpretation of 211 weekly wage checks to Appellant, in a span of time that, at most, included 156 weeks, easily gave rise to a reasonable inference that Appellant was systematically stealing money from Ms. Gulati by deceptively presenting her with excessive numbers of wage checks to sign. That some of the payments made to Appellant were in fact for proper reimbursements of expenses for Ms. Gulati did not render the evidence as whole insufficient because "[t]he evidence established at trial need not preclude every possibility of innocence and the fact-finder [wa]s free to believe all, part, or none of the evidence presented." *Commonwealth v. N.M.C.*, 172 A.3d 1146, 1149 (Pa. Super. 2017).

Properly reviewing the trial evidence consistent with our standard of review, we find that the bank documents showing apparent overpayments to Appellant, methodically distributed over a three-year span and contrary to the testimony reflecting Ms. Gulati's unchanging salary agreement with Appellant,

proved the necessary elements of theft by deception and financial exploitation of older adult or care-dependent person.[7]

In her second issue, Appellant challenges the legality of her sentence, alleging that the trial court "improperly applied" the "mandatory minimum" sentencing statute at 42 Pa.C.S. § 9717, which she describes as "not really mandatory." Appellant's Brief, 23. She asserts that improper application of this statute caused the trial court to erroneously accept an incorrect standard guideline range for her theft charge of twelve to fourteen months' imprisonment with no possible mitigated range consideration due to the parties' understanding below that Section 9717 set a mandatory minimum term of at least twelve months' imprisonment. *See* Appellant's Brief, 23-24. While Appellant characterizes her claim as a challenge to the legality of her sentence, for which no preservation is required below, *see* Appellant's Brief, 23-27, the Commonwealth argues that the claim is a meritless challenge to the discretionary aspects of the sentence imposed. *See* Appellee's Brief, 20-30.

As a preliminary matter, we must review the statute at 42 Pa.C.S. § 9717 to assess the proper nature of Appellant's claim and the appropriate standard of review. The statute provides, in relevant part:

> **(a) Mandatory sentence.--**A person under 60 years of age convicted of one of the following offenses when the victim is over

---

[7] Based on this conclusion, a preserved *corpus delicti* claim, as addressed above, would not have changed the outcome of Appellant's trial.

60 years of age and not a police officer shall be sentenced to a mandatory term of imprisonment as follows:

[…]

18 Pa.C.S. § 3922 (relating to theft by deception)--not less than 12 months, but the imposition of the minimum sentence shall be discretionary with the court where the court finds justifiable cause and that finding is written in the opinion.

(b) **Eligibility for parole.--**Parole shall not be granted until the minimum term of imprisonment has been served.

42 Pa.C.S § 9717(a)-(b).

We have only addressed the portion of Section 9717 discussing a sentence for a conviction of theft by deception in a single precedential opinion, ***Commonwealth v. Littlehales***, 915 A.2d 662 (Pa. Super. 2007), which neither party here has discussed in their briefs. In ***Littlehales***, this Court concluded that a challenge to the application of Section 9717 to a theft by deception conviction raised a challenge to the discretionary aspects of a sentence:

Section 9717(a), as it applies specifically to theft by deception, is different. This provision explicitly states that the imposition of the "mandatory" minimum is, in fact, **discretionary** with the court. Moreover, it is imposed not upon any specific finding of fact, but rather upon a generalized, discretionary finding of "justifiable cause." Thus, we hold that [Littlehales] raises a challenge to the discretionary aspects of the sentence. We will now examine the sentence in that light.

***Littlehales***, 915 A.2d at 664 (footnote omitted; emphasis in original).

While the panel in ***Littlehales*** unanimously concluded that a claim addressing the application of Section 9717 to a theft by deception conviction

raised a challenge to the discretionary aspects of the sentence, the panel was divided on the interpretation of the sentencing statute. The majority of the panel interpreted Section 9717(a) as providing that, before a trial court could impose a mandatory one-year sentence for theft by deception, it was required to find "justifiable cause and that finding is written in the opinion." ***Littlehales***, 915 A.2d at 665, ***quoting*** 42 Pa.C.S. § 9717(a). The dissenting opinion, however, interpreted Section 9717(a) "to require the imposition of a minimum sentence of 12 months unless the court finds justifiable cause to impose a *lesser* sentence, and explains that finding in a written opinion." ***Id.*** at 667 (dissenting opinion; Joyce, J.) (emphasis in original).[8]

Upon reaching the merits of Littlehales's claim, after concluding that his claim was preserved in post-sentence motions and raised a substantial question, the panel majority concluded that the trial court erroneously believed that the mandatory minimum addressed in Section 9717(a) was the "default option" and "the record d[id] not reflect that the court stated any contemporaneous reasons on the record supporting a finding of 'justifiable cause.'" ***Littlehales***, 915 A.2d at 666. Accordingly, the majority found that the trial court abused its discretion by misapplying Section 9717 and remanded for further proceedings where the trial court would be free to

_____

[8] In the nineteen years since ***Littlehales*** was decided, our Legislature has not acted on the dissenting opinion's urging it to revisit Section 9717(a) and clarify how it should be applied. ***See Littlehales***, 915 A.2d at 667-68 (dissenting opinion; Joyce, J.).

impose, or not impose, the "enhanced minimum," so long as the court did so consistent with the majority's opinion. *Id.*

*Littlehales* dictates that we construe Appellant's present claim as a discretionary sentencing claim. There may be reasons for distinguishing *Littlehales*'s conclusion that a claim addressing the application of Section 9717 to a theft by deception conviction implicates the discretionary aspects of a sentence based on more recent developments in our law concerning legality of sentence claims, however, we will not *sua sponte* step into the role of advocate for Appellant in those regards where she completely fails to acknowledge the existence of the *Littlehales* opinion, much less address its relevance to her claim. *See Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) ("This Court will not act as counsel and will not develop arguments on behalf of an appellant.").

In any event, under controlling precedent, Appellant's claim is a discretionary sentencing claim. Primarily, it faults the trial court for accepting an incorrect applicable sentencing guideline range due to its application of Section 9717. *See* Appellant's Brief, 26 ("Appellant should receive a new sentencing hearing because the guidelines were not properly calculated and there was no actual mandatory minimum."). Claims alleging an erroneous calculation of the applicable guidelines implicate the discretionary aspects of a sentence. *See Commonwealth v. Johnson*, 758 A.2d 1214, 1216 (Pa. Super. 2000) (a "challenge to the calculation of the Sentencing Guidelines raises a question of the discretionary aspects of a defendant's sentence").

Moreover, all of the cases Appellant cites in support of her claim address discretionary sentencing challenges, involving sentencing courts' failures to state reasons for sentences outside the Sentencing Guidelines' recommendations, rather than the legality of the sentences imposed: **Commonwealth v. Beatty**, 227 A.3d 1277, 1290-91 (Pa. Super. 2020) (vacating sentence and remanding for resentencing based on a trial court's failure provide to reasons for Beatty's sentence that was outside the range recommended by the Sentencing Guidelines); and **Commonwealth v. Byrd**, 657 A.2d 961, 964 (Pa. Super. 1995) (vacating and remanding for resentencing where sentencing court failed to "set forth in [Byrd's] presence the permissible range of sentences under the guidelines" and did not indicate that it was sentencing Bryd "outside of the guidelines and provide a contemporaneous statement of its reason for such deviation"). Based on the focus of Appellant's claim and the fact that **Littlehales** remains binding on us in the absence of cogent argument to distinguish it in the present circumstances, we find that we must review Appellant's claim as a discretionary sentencing challenge.

While the **Littlehales** majority ruled on the merits of the discretionary sentencing claim before it, it only reached the merits after it found that the claim had been properly preserved consistent with the requirements for review of discretionary sentencing claims. **See Littlehales**, 915 A.2d at 664-65 ("In order to challenge a discretionary aspect of a sentence the defendant must first raise the claim at the sentencing hearing or in post-sentence motions.

- 32 -

The record reflects that [Littlehales] raised this issue in post-sentence motions. Thus, the issue is preserved on appeal.") (citations omitted).

With respect to Appellant's claim, we find that it was not properly preserved for review. At sentencing, Appellant's counsel did not raise any objection to the application of Section 9717. Instead, counsel agreed to the "application of the mandatory," N.T. Sentencing Hearing, 1/29/25, 7, and simultaneously asked the court to impose a probationary or restrictive conditions sentence, alone, if the court was "inclined to depart from the mandatory."[9] *Id.* at 23-24. Appellant included a claim about the application of Section 9717 in her post-sentence motions filed on March 13, 2025, but those post-sentence motions would only preserve the instant claim if they had been timely filed. *See Commonwealth v. Wrecks*, 931 A.2d 717, 719 (Pa. Super. 2007) ("An untimely post-sentence motion does not preserve issues for appeal."). As we addressed above, however, those post-sentence motions were not timely filed and were legal nullities because they were not considered by and ruled on by the trial court prior to Appellant divesting the trial court of its jurisdiction with her filing of a notice of appeal. *See Commonwealth v. Santone*, 757 A.2d 963, 966 (Pa. Super. 2000) (order issued beyond the time period set forth in what is now Pa.R.Crim.P. 720 was a legal nullity because

_____

[9] The latter assertion reinforces our determination that Appellant's claim is a discretionary sentencing challenge because it suggests that Appellant's counsel grasped at the time, consistent with *Littlehales*' treatment of Section 9717 statute, that the statute at issue was a "discretionary mandatory minimum" sentencing statute.

the court no longer had jurisdiction to issue the order); *see also Commonwealth v. Martinez*, 141 A.3d 485, 490-91 (Pa. Super. 2016) ("[w]here there is no jurisdiction, there is no authority to pronounce judgment"). Appellant's untimely post-sentence motions could not preserve any discretionary sentence challenge for purposes of this direct appeal. *See Nischan*, *supra*, 928 A.2d at 355; *see also Commonwealth v. Cartrette*, 83 A.3d 1030, 1043 (Pa. Super. 2013) (*en banc*) (discretionary sentencing claim is waived where it is not preserved in a post-sentence motion or at sentencing).

We conclude that the evidence was sufficient to support Appellant's convictions and that Appellant waived her challenge to the trial court's application of the sentencing statute at 42 Pa.C.S. § 9717.[10] We thus affirm the judgment of sentence.

Judgment of sentence affirmed.

_____

[10] While we were unable to reach the merits of Appellant's sentencing claim, we will take this opportunity to renew Judge Joyce's suggestion to our Legislature in the dissenting opinion in *Littlehales* to revisit Section 9717(a) with respect to the crime of theft by deception. *See Littlehales*, 915 A.2d at 668 (dissenting opinion; J. Joyce). The apparent ambiguity in this "discretionary mandatory minimum" sentencing statute appear to remain unresolved nineteen years after the issuance of the opinions of our divided panel in *Littlehales*.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 8/3/2026